And if I could ask both attorneys that are going to present arguments to the ones that are going to present argument only, there are two. All right. So if you want to identify yourselves for the record justices talk to us on behalf of the California Fire Department, I'd like to reserve the floor to you. Jonathan Lowe on behalf of the Defendant Appellee. And have the appellees decided how much time you're going to? We'll split even. All right. Can I address one matter? Yes, certainly. One matter that I do address with counsel, Justice Taylor, you may recall that Thursday evening. I'm just now recognizing this lady. Yes. In this case, though not the orders that are before the court on appeal, but the case was before you for a while while you were on the bench. You accused yourself at one point, I believe, at C356. In my quick look at the index, maybe that order. I did not then, nor do I now, have any objection to your hearing the matter. I respect that. Thank you. I apologize because I'm just now going to see the lady, your client. So first of all, I'm recognizing that this case was before me at one point. So at that point I may recuse myself depending on what the other justices do. Well, should we take a recess? Yes, thank you. We'll take a recess. Thank you. All right. Why don't the lawyers step up again? We had a discussion with Justice Taylor. And since he participated at these proceedings at the trial court level, he's going to recuse himself from participation in the appeal. You know we have a third panel member, a fourth panel member. So I believe Justice House will participate as the third panel member in this case. He'll obviously listen to the arguments that are presented today, which are all recorded and available online as well. And we'll have an opportunity to fully read the briefs and the cases. And he will be the other participant in this decision. So just to let you know. Thank you. Okay. All right. So it's Mr. Harris? Yes. Okay. So you may proceed. Thank you. May it please the Court, Tom Harris on behalf of Violet Radwell. There are three defendants principally in this matter, one remaining at the trial court. It's not court to court. I'm going to dispense with the facts. Who is that? Mr. Radwell's son, Stephen Radwell, who signed the small estate affidavit. Okay. So there was no motion that there's nothing court to court either downstairs or here with respect to his involvement. So that complaint remains pending against him. And I guess on that subject, I think I should skip over to MB Bank because I think that their argument is coupled with Stephen Radwell's involvement. MB Bank, I believe, is liable for the conduct here not simply because, well certainly not because they paid out pursuant to the way the form was prepared. The county circuit clerk prepares that form. People fill it in. Other counties do the same. And it was paid out as it was filled in. However, it is incorrect as a matter of law. Violet Radwell, as the decedent's wife, was entitled to half and she was entitled to a widow's share. That's not how the affidavit was laid out. It was laid out as for a $10,000 widow's share and then in thirds between the two sons and Violet Radwell. Of course, one doesn't have to use a small estate affidavit and an estate, I believe, may still be pending or certainly was pending for quite a while out in DuPage County with respect to this matter. And the expenses of that estate would have been chargeable to that money. So the issue, I believe, as concerns the bank is should the bank escape liability because they paid out pursuant to the form and perhaps because the plaintiff has a remedy against Stephen Radwell, the affiant there. Certainly, the plaintiff does. Ms. Radwell has a cause of action against him. It remains good. It remains pending. And he is ultimately liable. Well, what about the statute's language that says that if the form is in, you know, if the document is in proper form, substantial form, that the bank has to pay? And under the facts here, we have essentially conflicting laws because that is not filled out pursuant to the law of intestate dissent. Go ahead. How's the bank? Why should we hold the bank to some sort of standard as far as what the statute says? I think the answer to that question is yet another question. Why should this plaintiff or any plaintiff similarly situated have to go after the – Is the form in the appendix? It is not. I just realized that. But it's in the record? It is. And isn't it just individual little things filled into blanks? For the most part, but there are choices that one makes in a small affidavit as set forth by the clerk of the circuit court of appellate. Well, give us an example of what would be the choice that the bank should have picked up on to be aware that there was some kind of error in this form. Well, one would have to be familiar with the law of intestate dissent or at least look at it. So the form wouldn't be – Is it your position that the bank should have a lawyer on call and every time somebody comes in with a small estate affidavit, they should bring it to a lawyer to determine if it's appropriately filled out? Does the statute put that responsibility on the bank? It does not require them to have a lawyer, but – The answer to your question, I think, that your opponents would say today is when you say, well, why should the bank escape liability? I think the answer to their question, according to them, is because the legislature said so. The legislature has put together this simplified way of proceeding by way of a small estate affidavit and it envisioned, they say, that the bank would, if it was in the proper form, the bank would pay out on it and it by definition is going to be smaller amounts of money. And if it's incorrect, then the cause of action is against the person who presented the small estate affidavit. Well, where's the bank's liability here? Because I believe the bank, like every other citizen, has a duty to follow the law and the law is, in terms of intestate dissent, that Violet Radwell was entitled to more than was here. And so when one weighs that burden, should we make the bank hire a lawyer or should we make other people hire a lawyer or deal with the mistakes and or fraud that are going to be happening? And I don't suggest that this was fraud, that Mr. Attorney Cofano was involved here, but it certainly was at least a mistake. In other instances in these situations, it is fraud. And someone goes into the bank. But doesn't your client have a remedy against her son? He has a, she does have a remedy. So then what's the problem? The problem is why should she have to go after personal liability? Why doesn't the bank pay it? And they can subrogate and go after the son. When one has a remedy against one individual, in many instances you may have a joint. But doesn't the statute say this is her remedy? Her remedy is to go against the person who presented it and not against the bank. Doesn't the statute envision that the bank will just follow the form and pay it out? Under your theory, is the bank supposed to launch an independent investigation of the status of the estate before it pays out on it? How is the bank supposed to know? Let me put it in a better way. How is the bank supposed to know that this form is incorrect? By having someone knowledgeable with respect to law of intestate descent, which I don't think is that big of a burden. Here they would have known that the children get half, the wife, widow, gets half. And they would have said no. So you think that just by looking at the form you can tell that it doesn't follow the law? You can. The bank has set out the numbers in their brief with 30,000, 7 to 7, 1.93, 20,000, 20,000 to each of the sons. So it was a split three ways. As I suggest in my brief, if an affiant put 99% to the children, 1% to the widow, would the bank similarly escape liability for paying out? Under the bank's argument and under a strict reading of the statute, one would say yes, that's the bank's only obligation. I think that conduct like that one would certainly have to step back from and say that's pretty obvious that that's not how the law of intestate descent and there's something wrong with this affidavit. And then we get to a point of really degree in terms of percentages. Here it's percentages between the three. And my suggestion, my argument is that the bank is in a much better position than your average person like Violet Radwell to know the law. Frankly, banks act at the direction of lawyers all the time. They have paralegals. And I don't think it's an undue burden for them to look at this affidavit not only as to form but also as to substance. As concerns Attorney Cofano, there was a motion for summary judgment the way it was resolved and attorney-client relationship is the big issue there because if there's an attorney-client relationship, then I believe there's some duty flowing therefrom. Didn't Mr. Cofano either by way of affidavit or was he deposed? He was not. Just an affidavit. He basically in his affidavit explains the conversation. There were two, weren't there? I believe there were two, yes. One principally that they began talking about. And he emphatically says that there was no attorney-client relationship established after both of those. True? He does say that. And was there a counter-affidavit filed? There was a verification of the plaintiff's complaint, not a counter-affidavit. So no counter-affidavit. That's correct. And even in the complaint, is there any, once there's an affidavit filed, if the non-movement doesn't supply a counter-affidavit, then the information contained in that affidavit stands, does it not? It does, and I think that affidavit actually supports my case. In other words, you can't use a verified complaint to defeat summary judgment when you don't file a counter-affidavit to deny or to suggest that there was an attorney-client relationship. That may be true. And the affidavit itself. Well, if that's true, which I believe it is, how do you prevail here? How do we reverse the granting of summary judgment when there was no counter-affidavit to dispute the testimony, the material testimony, that no relationship was formed, an attorney-client relationship? Because the facts that Mr. Cofano cites support fully my argument in two ways. With the argument that there was an attorney-client relationship? Yes, that there was an attorney-client relationship. Because, one, he says there was a discussion about a $4,500 fee for the handling of this estate. As I pointed out in my brief, that means there was a substantive discussion about what was going on here. One does not charge $4,500 to do a small estate affidavit. There had to be some factual discussion about what was going on here. Yes, but just because an attorney tells someone that if you want me to represent you, you're going to have to pay me $4,500, that, ergo, there's an attorney-client relationship. Well, Ms. Radwell was a prospective client, I believe, that was passing on information to Mr. Cofano. So are you moving on to the notion that this was a, what, prospective attorney-client relationship? Yes. So there was no attorney-client relationship, in fact, established? Well, at a minimum, there's a prospective attorney-client relationship going on here. And the two factual basis for that that come from Mr. Cofano's affidavit is, one, that there appears to be a substantive discussion. What substantive discussion? Where is there evidence before the court that there was a substantive discussion? Doesn't Mr. Cofano say, she came to me and I told her I'd charge her $4,500? Where's the substance? He says that, and he says that they talked about this estate. And he also says that he met with Mr. Romeo, who provided to him documents that the decedent gave to him. Or actually, Mr. Romeo revised those documents into a typed format. So now we have Cofano having what I believe is a substantive discussion about what's going to happen in this estate or what may happen, including a fee of $4,500. And Cofano also says that he received from Mr. Romeo a list of assets. Okay, here, let's go back to that conversation. Now, there's uncontradicted testimony that during that telephone conversation, Mr. Cofano stated that Ms. Radwell said that that was too much money, it was too expensive, and she wanted to contact other attorneys. The telephone conversation ended without plaintiff retaining me to represent her. Now, again, I'm going back to this notion that if a counteraffidavit isn't filed to defeat those claims, we accept them as true for purposes of the summary judgment motion. So if she doesn't deny that, that conversation in a counteraffidavit, that is accepted as true for purposes of the summary judgment proceeding that was in the trial court. I understand that. And also what's accepted as true is that portion of his affidavit where he's receiving information about this estate from Mr. Romeo. And so we have to consider what that information is and who and what capacity is it being transferred to. Mr. Radwell has died, so any power of attorney has died along with him. But is Mr. Romeo acting on his own behalf or is he acting on somebody else's behalf when he meets with Romeo, with Cofano, provides the details of the estate, provides these handwritten lists and apparently direction about what is supposed to happen with the estate. It's my suggestion that Mr. Romeo is acting at some level as an agent of the estate. He's certainly not acting on his own behalf. Well, you know, I know he didn't file any response brief. And you asked that in that instance then we should just reverse as far as the dismissal as to Mr. Romeo, correct? I did. But what kind of, where is there any, what was created by that conversation? What are you basically claiming was there between Mr. Romeo and? What I'm claiming is that Romeo is an agent of the estate when he transfers and discusses the estate with Attorney Cofano. He's certainly not there on his own behalf. He's there on behalf of the Radwell estate. What common law theory? I'm not sure I understand what he is or I don't know. What theory are you pleading against him? What duty did he have to do anything? Well, specifically as to Romeo. I mean, there has to be a duty. Correct. And what is it? Well, as to Romeo, now moving away from Cofano, which I was simply trying to impress upon you that all of his, all of Romeo's actions towards Cofano are on behalf of the estate at some level. Based on what though? I mean, when did he agree to do something? There is no estate when he's talking to this Mr. Radwell before he died. Mr. Cofano, Attorney Cofano says in his affidavit that I believe it's October 27th. This is before the decedent died months before. First contact was contacted by Romeo saying Mr. Radwell is ill. He wants an estate prepared. But wouldn't he be an agent of Mr. Wouldn't he be at that point? Even if he was an agent, as opposed to just doing someone a favor, wouldn't he just be an agent of Mr. Radwell? He would in October, yes. So there's no estate yet. I'm sorry? So there's no estate yet. There is not. So none of this conduct between Romeo and Cofano has anything to do with your client. It does in some part. It doesn't establish an attorney-client relationship between, at most, it establishes an attorney-client relationship between Cofano and the decedent before he's dead. But Mr. Romeo continues to act after, in fact, the day Mr. Radwell died, immediately after it. And so at that point, he's not acting under, I don't believe, an agency relationship with the decedent, but instead on behalf of the estate. And who is Your client is not the estate either, is she? No, but she is the presumptive representative, and as a matter of law, she is the presumptive representative of the estate as the widow, and she has preference over the two stepsons, certainly, so that Romeo's actions are on behalf of the estate, i.e., Ms. Radwell. This is in addition to the conversation that Ms. Radwell has with Attorney Cofano. So I believe Well, since Romeo isn't here, I mean, I suppose we should kind of, you know, keep things moving along, but I'm not sure I understand any duty of any kind that Romeo has. So I know there's an agreement between the decedent and Mr. Romeo about Mr. Romeo is to contact the boy. Okay. What kind of an agreement is it? What is it? I mean, are you calling it a contract or what? I'm calling it a contract. Okay. So then I guess I would have to ask you, if this was a contract, what was in it for Mr. Romeo? I mean, there has to be some reason, some consideration for him to be undertaking whatever it is you're saying he had a duty to do. That's what I guess I'm getting at. I don't see anything that was occurring there other than one friend talking to another friend, and then, you know, asking someone to do something doesn't bind them to do it. Well, I believe that they share both a professional and personal relationship, and that they had done business together in the past, and that this transaction was of that nature, of a business relationship. Well, what's the consideration? I mean, if I ask you to pick up my cleaning at the end of today, and you say, okay, and then you don't do it, can I sue you? What's the consideration? What does Romeo get out of this other than friendship? What's the difference between a contract and a favor? Because the ‑‑ And do you allege, but by the way, most importantly, in your pleadings, which by the way, you know, you say in your pleadings, in your complaints, that this is a breach of contract action. And then in your issues presented section, you say this is a negligence action. And then you say it's a negligence action and a breach of contract action. And then you say, well, it's not really negligence. It's a breach of contract. So first of all, I ask you to choose your arrow and tell us what it is. And then tell me where in your complaint you allege that Mr. Romeo benefited by way of some consideration. That's fair, because I think in my complaint I do mix those causes of actions, and I acknowledge that duty as a negligence concept, breach of contract, obviously a breach of an agreement, contractual breach of contract. And the question is, where do I allege some consideration that Romeo was to receive for this, making it more than just a favor between personal friends as opposed to the professional side of that relationship? Frankly, I think the context of it and the fact that they had done business together professionally overrides whatever personal relationship the two of them may have shared. So if we have had other business relationships and then I say, do this for me, and you say, okay, that's consideration? If there's an expectation that you are going to get paid, certainly. Well, do you allege anywhere in your complaint that there's an expectation on Mr. Romeo's part that he's going to get paid for this? Without looking at it immediately, I can tell you the answer is no. Okay. I think that the professional side of the relationship is what I was trying to plead there, that the two of them, in addition to having some friendship, there's no question they had a professional relationship with each other. And since this is, I believe, in the nature of more of a professional undertaking than picking up your cleaning or doing some personal favor, that it would fall into a contractual agreement between the two where he was to undertake that. I recognize that there's also cases, a recent case from this court that dealt with that, and I've tried to distinguish it based on contract theory. But whether or not he's a friend or being paid doesn't exonerate Cofano because Cofano is receiving information from the estate at the point after Mr. Radwell dies, where he actually gets these documents from Romeo. And now when he goes and he takes out an attorney-client relationship with Mr. Radwell, that's where the attorney-client relationship has been breached, is my allegations, and the damages that I've alleged flow from that. So I understand the concern about Romeo, but as concerns... I don't know if he's acting on behalf of Stephen. I'm sorry? You're making a leap that once he passes, then if there's a relationship between Romeo and the decedent, I'm sorry, and the... Before he died, that once he passes, that this relationship between Romeo and him bounces to the estate, how do we know it doesn't bounce to Stephen? Well, I don't know why it would bounce to Stephen, because Stephen's not any sort of presumed administrator, and we don't have a will, so we don't have an agency that has preference to be the administrator of that estate. Indeed, Pro Se tried to start that on her own and was told, no, you have to have a lawyer. So Violet is the estate, the representative of the estate, until somebody else comes in and files a petition, and so... I'm going to ask you to sum up, and you'll have some time for rebuttal. So it's a series of unfortunate errors, all connected, all of which have damaged Ms. Radwell, and I don't think, because Stephen Radwell ultimately can be liable for that affidavit, that that exonerates the bank, and I don't believe that Mr. Profano's affidavit exonerates him, but in fact plead facts in addition, which create questions of fact here. Thank you. Good morning, again, Your Honors. Plaintiff has taken the extraordinary step of asking this Court to approve the affidavit provisions of the Probate Act without supplying any legal authority. It's never directly presented to the Court, but that's essentially what they're getting at, and the reason why plaintiff is taking that position is because plaintiff well knows that under the small estate affidavit provisions, MB Financial has no responsibility, and she admits such in her brief when she concedes, quote, the valid point of MB Bank is concerned Section 25-1 of the Probate Act, which speaks to small estate affidavits. Under that statute, Section A-1, the bank was required to pay out when presented with an affidavit in proper statutory form signed under penalty of perjury, and there's no dispute that that's what happened in this case. Subsection 1D further provides the bank is then released from all liability once it pays out pursuant to those terms. Again, there's no dispute that the bank paid out pursuant to those terms. It paid out $10,000 more to the plaintiff, about $30,000, then to the two step-sons, about $20,000 each. As Justice Palmer correctly pointed out, the statute provides an avenue of relief for the plaintiff through any recipient of the funds under the affidavit, which means she's got two avenues of relief, one, Stephen Radwell, who she obtained a order of default against in March of 2011, and the other, Richard Radwell, Jr., who she still can't seek relief from. Well, the appellate asks the question, if the small estate affidavit is presented to the bank and it gives 99% of the estate to one son and 1% to the wife, are you under any obligation to question that? That is a theoretical question that was posed by the appellant, which is not even remotely true in this particular circumstance, where the plaintiff received the largest of the three shares. Counsel or plaintiff suggests that really the laws and test date distribution, which is Section 2.1 of the Probate Act, apply here. But they couldn't be further from the case. The Probate Act provides a coherent framework for distributing assets of an estate. If you have a small estate, which means less than $100,000, those assets can be distributed pursuant to just the affidavit, as opposed to if the decedent dies in test date and probate seedings are initiated, then those assets are distributed outside of the affidavit in court. So the small estate affidavit sections provide an individual with a de minimis estate the ability to distribute those assets without going through what can be costly and timely probate proceedings. The law is clear that if two statutes relate to the same subject, it's presumed that they are harmonious, even when there's an apparent conflict. There's no apparent conflict in this case. Plaintiff also suggests that she did not get her spouse's award. I'll refer you to the common law record. The affidavit is in the common law record, and the citation is in the second volume, pages 489 to 490. And it explicitly provides for a spouse's award of $10,000 to the plaintiff. That's why she got $10,000 more. The statute was later amended in 2010, three years after the decedent passed away, to increase that amount to $10,000. All of this talk about the statute sort of forgets the issue that a plaintiff has brought a negligence count against the bank, a negligence count. And it's clear under the Mormon doctrine that a negligence count cannot be brought where that plaintiff seeks purely economic damages, where there's no personal injury or property damage, and there was none of that alleged here. It's also clear under the law that a bank has no duty to a non-customer. It's clear in the record she's a non-customer. She's a complete third party. She was not an owner on any of the three accounts at MV Financial. They were all individually owned by the decedent. She never presented the affidavit that was presented by the stepson. She never presented the affidavit that was presented by the stepson. If no duty is owed to her, which is a matter of law, then she can't bring a negligence claim against the bank. So a plaintiff cannot bring a legally recognizable claim of negligence against a bank. The main issue is that the bank at all times followed the small estate affidavit. There's no question that it did not. So it is clear that the court has not released any liability to plaintiff in this matter. Anything further? No, Your Honors. We'll hear from Mr. Lowe now. Good morning, Your Honors. Good morning. It's unusual to see you up here because I argued before both of you when you were sitting in the circuit court. I remember those days very well. I represent Richard Caifano, who was being sued for legal malpractice and re-judgment was granted for Richard in the trial court because there was no attorney-client relationship. I want to spend just a couple of minutes talking about the facts because the undisputed facts are clear in this case. We know that Romeo told Caifano that Richard Radwell wanted to talk to a lawyer about estate cleaning, but Caifano and the decedent never had a conversation. Caifano never did any work for the decedent. So there was no relationship between them whatsoever. The only thing they had in common was Louis Romeo. Now, several months later, February 20th, Richard dies in test state. Romeo tells Caifano that Violet might call to ask him about probating Richard's estate. Violet then calls Caifano, asks him what he'd charge. He says $4,500. She says, I want to talk to other lawyers. And that's it. There is no evidence about any more expansive conversation and that is undisputed. So there was no attorney-client relationship that arose. Now, there has been a suggestion. Was there a second conversation? There was a second conversation several weeks later, and at that point Caifano told Violet that he couldn't represent her because he had already agreed to represent the decedent's son in the estate. Now, there's been a suggestion that there was a prospective client relationship here because documents were received subsequent to the conversation identifying assets of the decedent. I think we all have to remember that this is an intestate proceeding and there's nothing confidential about those documents. Everything is going to be done in the fresh air and the sunshine. The assets are what they are and the law is going to distribute them to whoever is entitled to them. So there's nothing confidential about that. Well, what are in those documents? I don't know because they're not part of the record. But that was the allegation that was made. Yes. And wouldn't the fact that we don't know also tend to put us in a position where we would have to not presume that there was anything in those documents that would have caused us to come to the conclusion that a relationship was formed? We don't know what's in the documents? I can't respond to the question because I don't know what's in the documents, but we do know that there is an affidavit from Richard Caifano saying he never agreed to represent her. We do know that this asset list, whatever it is, is not part of the record also. So it's just not there for purposes of this conversation. And then finally, we talked about what Violet said later on. Violet called him later on and he said, I'm already representing Stephen because Stephen had called him up and asked Richard to represent him and Richard agreed. So there has been speculation here about what was admitted outside of this lawsuit. And there has been no discussion as to where that kind of speculation comes from. There's been no support for it. There has been a speculation that Rule of Professional Conduct 1.18 regarding prospective clients memorialized practice in existing law and there's been no support for that argument. And there's been speculation about what Caifano did for Stephen and his charges. And she wasn't a party to that relationship and she doesn't know. All we're talking about is speculation. The only thing we know is that and she judicially admits this, is that there was no attorney-client relationship. And without an attorney-client relationship you can't have an action for legal malpractice. There was also a suggestion that there was an agency relationship between Romeo and the decedent and that was what he was acting on when he approached Caifano. And that can't be the case because we know that under Illinois law agency terminates on the death of the principal. I don't really have anything else to say. Can I just ask one question? I'm sorry. Could you go through the math for us? Because there's some suggestion in the briefs that well, obviously the appellant believes that the math was wrong in terms of the way the affidavit was filled out. And you've taken the position that the math was correct. But also I think I saw in there that you've taken a position that the math is different when it's done by way of a small estate affidavit. I can't talk to you about the math because our client didn't prepare the small estate affidavit. It's not alleged to have prepared it. Stephen was the one that signed it. Okay. But didn't you discuss that in the brief though? I did not discuss it. Okay, maybe it was MP. No, that was not covered in my brief at all. Okay. Maybe it was MP. Okay. Thank you. All right. Barris, brief rebuttal. In terms of the math, the affidavit is set out 30,771.93 to Violet, 20,771.93 to each of the two sons. What it should have been is essentially 41,315.79 to Violet. Frankly a relatively small sum to be before this court on. However, it's our position that this is an occurrence that is not infrequent and Violet has brought it this far. I've tried to talk in broad terms about the bank's duty, but specifically in this case I've pled the bank knew that there was a problem brewing, that Violet had contacted, gone into the bank, had called them, had actually met, and I put names from bank individuals. And then of course when she hadn't heard from Cofano after that, the next thing that she knows about six months later a check shows up. She goes back in the bank again and says, why is this check here? Because she's trying to deal with the estate. While the percentages here are 16 and two-thirds difference, Violet should have had 50%, she's got a 33 and one-third percent. One could easily see if there were four children and a widow, then you would have under the scheme that was presented here 20% to each if there were five and split instead of 50 and then the other 50. So depending on how many children, you're going to get a much different result. And as concerns a de minimis, as the bank's counsel suggests, one man's de minimis is really a significant amount to the other. I don't have anything... But what about the release language in the statute? Aren't you asking us to just ignore that? I'm asking you to recognize that there's a conflict here in what the bank has done. They've followed the small estates affidavit, but in doing so they've disregarded the law of intestate descent. And what I'm asking is, who should bear the responsibility for going after Steven and people like... similarly situated? The bank is in a far better position. If they wanted to just tender the money back in, they should have done so and say, you know, we made a mistake. But they don't. They just say, we blindly followed the statute and notwithstanding Violent contacted us well ahead of time, all we're going to do is read within the four corners of the document. And I think that under the circumstances pled here and frankly generally that a bank has greater duties to follow the law like every citizen including Steven Radwell does to deal with the law of intestate descent under these circumstances. Thank you. Alright. The case will be taken under advisement. We're going to take a short recess because we need to call the other panel member for the next case.